1 of 46

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
**KEY WEST**
CASE NO. **15-CR-10009-JEM-1**

---

**UNITED STATES OF AMERICA**,
Plaintiff
vs. **January 26, 2017**

**HARLEM SUAREZ**,
Defendant.

---

**TESTIMONY AT TRIAL OF DR. DANIEL BYMAN**

BEFORE THE HONORABLE **JOSE E. MARTINEZ**,

UNITED STATES DISTRICT COURT JUDGE

---

**A P P E A R A N C E S**

FOR THE PLAINTIFF: UNITED STATES OF AMERICA
**KAREN E. GILBERT**, AUSA
**MARC S. ANTON**, AUSA
United States Attorney's Office
99 NE 4th Street
Miami, FL 33132
(305) 961-9161
Karen.gilbert@usdoj.gov.
Marc.anton@usdoj.gov

FOR THE DEFENDANT: HARLEM SUAREZ
**RICHARD F. DELLA FERA** , ESQ
Entin & Della Fera
633 South Andrews Avenue, Suite 500
Fort Lauderdale, FL 33301
(954) 761-7201
Richard@entinlaw.com

REPORTED BY:
**GIZELLA BAAN-PROULX**, RPR, FCRR
United States Court Reporter
400 North Miami Avenue, Suite 8S32
Miami FL 33128
(305) 523-5294
gizella_baan-proulx@flsd.uscourts.gov

Also present:
Jay Chris Klettheimer

2 of 46

**P R O C E E D I N G S**

*(The following proceedings were held in open court.)*

* * * * * * * * * * *

***(Thereupon, proceedings were held but not transcribed.)***

11:07 * * * * * * * * * * *

Thereupon,

**DR. DANIEL BYMAN**

having been duly sworn by the court reporter, testified as follows:

11:07 **THE COURT**: Please be seated. Get as close to the microphone as you can. Tell us your name and spell it.

A. **Daniel Byman. D-A-N-I-E-L, B-Y-M-A-N.**

**THE COURT**: All right. You may proceed.

11:08 ***DIRECT EXAMINATION***

**BY MS. GILBERT:**

Q. If you need to adjust that, I would say go ahead.

**THE COURT**: He is a professor. He probably could figure that out all by himself.

11:08 A. **Probably not, Your Honor.**

**BY MS. GILBERT:**

Q. Dr. Byman, please tell the ladies and gentlemen of the jury where you're currently employed.

A. **I am a professor at Georgetown University and also a senior**

11:08 **fellow at the Brookings Institution.**

3 of 46

11:08 11:09 11:09 11:09 11:10

Q. What is the Brookings Institution?

A. **It's what's called a think tank in Washington D.C. It does analyses on issues related to the U.S. government foreign policy and domestic policy issues.**

Q. And how long have you been a professor at Georgetown?

A. **I became a full-time professor at Georgetown in 2003.**

Q. And prior to that, I imagine you went to maybe college and graduate school?

A. **I went to Emmet College, and I got my Ph.D. at MIT.**

Q. And what field is your Ph.D.?

A. **Political science.**

Q. All right. Have you done work or done studies and research in the field of terrorism and national security?

A. **The vast majority of my work for the last 25 years or more has been on terrorist and national security issues.**

Q. Have you written books, have you published books about it?

A. **I've published six books, four of which are explicitly about terrorism, as well as many monographs, dozens or maybe more articles, and many oral interviews.**

Q. How does one sort of from the education field learn about terrorism?

A. **I began my career working as an intelligence analyst with the U.S. government. After that I stayed very interested in national security terrorism issues, and you do in ways as a good reporter does where you spend time looking at court**

11:10
11:10
11:10
11:10
11:11

**records.**

**You go around the country, and in my case around the world, talking to officials who have been investigating terrorism, talking to experts of various sorts, talking to people at the ground level who have worked with terrorists or worked trying to fight them, and you spend a lot of time reading.**

**So you read statements of groups and transcripts. A lot of what we have for groups like Al-Qaeda or Bin Ladin's group. We have a lot of records that are internal records that have been captured, so we have thousands of documents that are the group cell's records on what they do. So a lot of my time is sent reviewing that material.**

Q. And have you ever testified like this, in a U.S. courtroom in a terrorism case?

A. **Not before a jury in a U.S. courtroom. I have been part of a proceeding in Canada before a judge.**

Q. All right.

**MS. GILBERT**: At this time, Your Honor, I would offer Dr. Byman as an expert in the field of terrorism, terrorism recruitment, and national security.

**THE COURT**: All right.

**MR. DELLA FERA**: I don't think that that foundation has been fully established, so I would object.

**THE COURT**: You want to voir dire? Go ahead. Your

5 of 46

turn. If you want to.

***VOIR DIRE EXAMINATION***

**BY MR. DELLA FERA:**

11:11 Q. Dr. Byman, when you talk about your study of terrorism?

**THE COURT**: She has the microphone down at her level. Raise it up a little. No offense, Ms. Gilbert.

**MS. GILBERT**: None taken.

**BY MR. DELLA FERA:**

11:11 Q. When you talk about your study in terrorism, you talk about these internal documents, I guess, that have been sort of taken off from Afghanistan and Pakistan and places such as that, correct?

A. **Among others, yes.**

11:11 Q. With regard to recruitment, do those internal documents refer to any kind of recruitment?

A. **A lot of them are about recruitment. They're about how you get people to countries, how you win them over, problems they have with recruitment, the quality of recruits, their knowledge, their skill base. That's a lot of what the** 11:12 **documents concern.**

Q. And this relates to Al-Qaeda and what other groups?

A. **Al-Qaeda, Islamic State, Lebanese Hezbollah, and there are a lot of kind of spin-off groups. I can go through a long list, but it's groups in that broader mindset.** 11:12

1  Q.   As far as the internal documents that have been obtained

2  from the Islamic State, those documents are not as extensive as

3  other groups such as Al Qaeda, correct?

4  A.   **It's different.  As everyone in this room knows, it's kind**

11:12  5  **of a new world where a lot of -- when you terrorism 15 years**

6  **ago, it was often hard to get information.**

7  **Now the problem is too much information where a lot of**

8  **the documentation is through social media or through things**

9  **that -- through interviews that can easily be recorded.  And**

11:13  10  **given the thousands of people who have joined this group,**

11  **there's just a lot of information.**

12  **So we have a lot of records that have come out almost**

13  **from a ground view of this group that's very different from the**

14  **past where the documents tend to be more topped out.**

11:13  15  Q.   And --

16  **THE COURT:**  Doctor, you're a fast talker.  Slow down a

17  little bit because my interpreters are having a breakdown over

18  there.

19  A.   **I apologize, Your Honor, will do.**

11:13  20  **THE COURT:**  Go ahead.

21  **BY MR. DELLA FERA:**

22  Q.   Let's take Al-Qaeda, for example.  When the U.S. military

23  invaded Afghanistan, they were able to come across documents

24  that Al-Qaeda had left behind when they fled Kabul and Kandahar

11:13  25  and places like that, correct?

A. **Yes.**

Q. Now, we don't really have that with Islamic State because there hasn't been a ground invasion of that area of Syria and Iraq to get internal documents, correct?

11:14 A. **There was an Islamic state defector, I want to say last year, that surrendered thousands of personnel records, and they were made public. There were a number of papers readily available, and they've been analyzed fairly extensively.**

**And so in a way, it's again, different from what we have with Al Qaeda where it was more of a topped-down effort, but this is kind of a mass look at the low-level soldiers, if you will.**

Q. And have you read those documents?

A. **I've read some of them and some of the studies, but I've not read every single document.**

**MR. DELLA FERA:** Judge, that's all I have.

**THE COURT:** I believe he's an expert. I'll permit it, but, as you know, the judge doesn't have to accept it. It's up to the jury to decide whether he's an expert or not.

11:14 **MR. DELLA FERA:** And I'll just renew my pretrial motion, Judge.

Thank you, sir.

**THE COURT:** You can fix the microphone again, Ms. Gilbert.

11:14 **BY MS. GILBERT:**

8 of 46

Q. What is terrorism?
A. **There are a number of different definitions floating out there, but people who work in the field usually focus on four elements of terrorism. The first and probably most important is that it's about politics. So it's not just -- it's not about money, it's not about personal revenge or anger that the motive has to be political.**

**A second characteristic is that it's violent. So, you know, someone protesting is not terrorism as long as it's peaceful.**

**The third characteristic is that it's what we call a non-state actor. And what that means is it's simply not governments. So if a government bombs someone, if the government kills someone, it might be horrible, but we don't call that terrorism because we're focused on groups that are not government.**

**And the last characteristic is it's designed to have a far-reaching psychological effect. So the point isn't just to hurt someone or kill someone because, again, you don't like them or maybe even to make a narrow political statement. Rather, you want to send a message. You want to have an impact well beyond that individual.**
Q. And are you familiar with the Department of State list of foreign terrorist organizations?
A. **Yes.**

9 of 46

Q. All right. And does Islamic State or ISIS or ISIL appear on that list?

A. **Yes, it does. This is a group that's had multiple names in its history, so it has shown up under different names, but it's been on the list under earlier names since 2004.**

Q. Since 2004. So in April through July of 2015, was the Islamic State or ISIL a designated foreign terrorist organization?

A. **Yes.**

Q. And the four characteristics or elements that you just described to us of these groups, does the Islamic State fit those four elements or characteristics?

**MR. DELLA FERA**: Objection to the relevance, Judge.

**THE COURT**: Overruled.

A. **Yes, it does.**

**BY MS. GILBERT**:

Q. And where is the -- and I'll use the term Islamic State.

A. **That's the best current usage, yes.**

**THE COURT**: For two weeks now it's been that current? What's the difference between the different ones?

A. **If -- back in 2004, this group called itself part of Al Qaeda just the Iraq branch. Then it decided that it was the leader of a coalition, and it called itself the -- kind of the -- used the term MSM, but the holy warriors consultation group --**

10 of 46

THE COURT: It's kind of a hokey nickname, isn't it?

A. **Yeah, they dumped that one pretty quick. Then they decided it was truly an Islamic State but only in Iraq. Then they decided it was an Islamic State not just in Iraq but in greater Syria which is why they have Islamic State of Iraq and Syria, ISIS, but the term they use also can mean the Levant in greater Syria, so some people from the government call it ISIL. And then they dumped all that and said we're just the Islamic State everywhere. And that's their current approach, but not everyone using the same acronym when they were ISIS, so people still use that term even though it's a bit dated.**

BY MS. GILBERT:

Q. I'll refer to it as the Islamic State during the questioning. Do they have a leader?

A. **They do.**

Q. And how did that person become the leader and who is it?

A. **He was a man named Abu Bakr al-Baghdadi. And he is someone who had been fighting U.S. forces in Iraq after the U.S. invasion and occupation in 2003. He was briefly imprisoned by U.S. forces, and he went back to fighting, and he rose through the ranks, and he became a leading ideologue, someone who was part of the propaganda apparatus. And then when the two main leaders were killed in 2010 by U.S. forces, he rose to the top and has been a leader since 2010.**

Q. Do they have an election, or is he self proclaimed?

11 of 46

**MR. DELLA FERA:** Judge, I'm going to object to the relevance of this historical --

**THE COURT:** Explain the relevance.

**MS. GILBERT:** During the conversations when the defendant talks about Baghdadi or things like that and puts context, that he knows what in fact is really happening.

**THE COURT:** All right. I'll permit it with limitations as to time.

**MS. GILBERT:** Yes, sir.

11:19 **BY MS. GILBERT:**

Q. Just briefly, was there an election, or did he claim himself?

A. **He claimed him, but it was more like a small power group within the organization agreed on him chosen. So not an election, but he had the backing of some key people.**

Q. And in very simple terms, what's the goal of ISIS or Islamic State?

A. **They want to establish --**

**MR. DELLA FERA:** Objection to relevance, Judge.

**THE COURT:** Overruled.

A. **They want to establish a religious state based on Islamic law really around the world and focused very much on Iraq and Syria right now, but they want to expand it, consolidate, and have it spread around the world.**

11:20 **BY MS. GILBERT:**

12 of 46

Q. And when you say spread around the world, do their philosophies or objectives permit other religions, or do they want to control it all?

A. **They certainly want to control it all. Some religions can be there if they're subordinate. So if they pay extra taxes, if you're Christian, if you don't build a church, if you really keep it low and accept, I'll say, probably or fourth-class status.**

**And in particular, they're very against other types of Muslims who don't believe exactly what they believe. And then there are people, they say, who aren't monotheists. So what got a lot of attention were Yazidis which were like Baha'is, a lot of religious minorities who they consider really pagans who should be killed or enslaved.**

11:21 Q. And what is a caliphate?

A. **A caliphate refers to the government, a religious government led by the leader of a Muslim community; in this case, the Islamic State, would be Baghdadi. And I would say a religious government that stands -- states, in their eyes, is the true righteous form of government.**

Q. And back in 2014 and early 2015, was the Islamic State actually taking over physical geographical territory in Syria and Iraq?

A. **At the height of its power during this period, the Islamic State controlled the territory roughly the size of Great**

Britain. Several million people were under its rule, and it seemed like it was rapidly expanding.

It did fairly well in 2014 in Syria. Then it rapidly expanded in Iraq. And throughout early 2015 there were different parts of the Muslim world, so in Libya, in Nigeria, in the Sinai Peninsula in Egypt, where groups would say we're loyal to the Islamic State; we're part of this group. So it claimed what it said were provinces around the Muslim world, and there were dozens of these, some really on paper and some quite big.

Q. And in early to mid 2015, did their movement get within 60 miles of Baghdad?

A. Yes.

Q. Okay. You mentioned a moment ago propaganda. Can you just generally explain to the ladies and gentlemen of the jury how the Islamic State uses propaganda?

A. Every terrorist group uses propaganda. It's how they get their message across, but the Islamic State has put this on steroids.

They've long had dedicated propaganda units that are skilled people producing very high-quality video, extensively engaged in social media. They have televisions, they have radio, and extensive social media. But they also rely on a lot of part-time supporters around the world.

This is a big change in the media environment where

11:23
11:23
11:24
11:24
11:24

people who are not, you know, master technicians who don't have to be George Lucas here can produce fairly high-quality videos.

So they'll put out a lot of content, and they'll rely on people in Europe, people in the Muslim world to put it into new videos. And at their peak, they were putting out roughly a thousand videos a month.

And they're also extensively using social media, especially Twitter, and they use Facebook, and, really, they're composed of many young people, so they're very good at tapping into the very latest social media technology.

Q. And in what language are these high-quality videos and social media messages?

A. They produce in many languages. So as you'd expect, of course they produce in Arabic, but they also produce extensively in English, in French, in Russian, in Turkish. There are other languages as well.

They have a lot of people from around the world who work with them, who support them, and they take advantage of their language and technical skills.

Q. We talked a moment about ISIS and taking over physical territory in the Middle East.

Do they also have a mission of what they want to do in the United States or in the west?

A. Their long-term goal would be to control the west, to spread Islam and Islamic law here, but that's a very long-term

**goal even for the most ambitious of their members.**

**In the more immediate term they would focus on a couple of things. One is they believe the United States and Europe are at war, and that we're attacking them in general. We are subjugating Muslims.**

**And so they want, to some degree, revenge. They want some degree of intimidating the United States to force us to not be involved in the Middle East. And so they would be using violence to send messages to America in their eyes.**

**And they also want to use hatred of the west to inspire supporters. So with the problems in the west, they try to play them up to convince people to join their cause.**

Q. And in 2014 and 2015, was there a propaganda or messages put out by the Islamic State and its supporters to conduct attacks specifically in the United States?

A. **In September 2014, there was a very dramatic statement by the spokesman of the Islamic State who's also believed to be -- was believed to be the head of its terrorist operation for the west who called for attacks in the west.**

**He said that you should attack the United States. He thinks of the United States, France, Canada, he mentioned other countries involved in the military operations against the Islamic State.**

**And he said that you should attack their soldiers, their security forces, their intelligence officers. And that**

16 of 46

attacks on civilians is okay.

It was a long list of blow them up, hit them over the head with a rock, push them off buildings. It was a long exaltation to engage in violence.

11:26 Q. Okay. So you said there was a call for attacks. How was it that the spokesperson put out there to conduct these attacks of these particular targets?

MR. DELLA FERA: I'm going to object to relevance.

THE COURT: Overruled.

11:26 A. There were video statements. And these were widely disseminated through the internet. And so you could see clips through a range of internet providers, some of it was broken up, some of it was done through various social media forum.

So there was initial video. Then there was follow up,

11:26 but again, this was a group that produced lots of statements, so there are lots of variations.

BY MS. GILBERT:

Q. Let's talk specifically about the targets. Who were the specific targets? Or what groups or categories were the

11:27 targets that Islamic State said attack in the west?

MR. DELLA FERA: Object to relevance.

THE COURT: Overruled.

A. The ones that were mentioned in the September statement were about -- they would see police and intelligence on the

11:27 base of security forces. And that was in the context of forces

from the United States or U.S. allies that were bombing or attacking the Islamic State; so that range.

But they also talk about civilians being culpable. So you can attack civilians, and they're guilty. And when you do so, that's justified as well. So it was a very broad range.

11:27

Q. All right. So cops and military?

MR. DELLA FERA: Objection, leading.

BY MS. GILBERT:

Q. Were cops and military part of the targets?

11:27

MR. DELLA FERA: Objection, leading.

THE COURT: Overruled.

A. Yes, they were.

BY MS. GILBERT:

Q. All right. What about cartoonists? What does the Islamic State have against cartoonist?

11:28

A. This always seems rather odd to people who are new to this. But in way back in 2005 there was a Danish newspaper that published a series of cartoons making fun of the prophet Mohammed. And that's kind of a double insult to very devout Muslims.

11:28

One is that in general there's a prohibition on showing the human form. That is a bad thing to do. And then they're mocking what they feel is the prophet of God, so double insulting.

11:28

And there were death threats. There were repeated

18 of 46

attempts at terrorism in Denmark against that paper. And then this was picked up by other newspapers around the world as really often attempting to show solidarity, that they're not going to be intimidated by them. So different places republished them.

11:28

And so this was a constant from 2005 where we'd see attacks, people mention these cartoons, and how angry they were.

And in 2013 an Al Qaeda group in Yemen, which published a very impressive English-language propaganda sheet created the hit list. And a number of people on that hit list were cartoonists, were people who were part of this.

11:29

So this sent some kind of outrage and anger has been very important to them, what we see orbiting in January of 2015 was a terrorist attack in Paris at the offices of basically a cartoon newspaper in Paris.

11:29

Q. Is that what most people would know as the Charlie Hebdo attack?

A. Yes. Charlie Hebdo was a French kind of comic newspaper that produced really kind of biting harsh cartoons, not general cartoons. And it was done by this Al Qaeda group as a sense of anger and revenge for these cartoons.

11:29

Q. And has the Islamic State picked up cartoonists as a target of their own?

A. They have also mentioned this, and they've said that this

11:30

**is proof in their eyes that the west is hostile to them. It's proof of the constant insulting of Islam, and the Islamic State wants to get recruits. So it's time to play up themes that anger people, and this is one of the things that does.**

11:30 Q. And have there been other attacks in the United States on cartoonists or buildings related to comedy?

A. **One of the motivations of the man who tried to do a car bombing in Times Square in 2010 was linked to --**

**MR. DELLA FERA**: Judge, I'm going to object because of

11:30 the time frame, that it's not relevant.

**THE COURT**: All right. Do you want to -- no. I'll permit it as background. Go ahead. You can continue.

A. **-- was that this was a building where Comedy Central was, and the comic -- the comic show South Park had made fun of this**

11:31 **as well. So again it's shown up in multiple contexts.**

Q. Okay. Staying on the theme of attacks within the United States, have there been attacks in the United States that ISIS has claimed responsibility for?

A. **Yes.**

11:31 Q. And can you just briefly tell us which ones.

A. **Sure. The first one was this attack in May 2015 in Garland, Texas, at an exhibition about -- that were portraying cartoons of the prophet Muhammad, so that was the first one, a very dramatic one.**

11:31 **They also claimed the attack in San Bernardino in**

20 of 46

**California at the end of 2015. They claimed the attack on the Pulse Nightclub in June 2016.**

**And they also talked about other less-lethal attacks as being -- the phrase they'll often use is our supporters are soldiers of the Islamic State.**

**So the belief for all of these attacks is not that it was someone in Syria organizing these attacks but, rather, that they were seeing these attacks as being done by supporters around the world in their name.**

11:32 Q. Okay. So talking about these supporters that do attacks in their name, do they have to be in direct communication with or even contact with someone in the Islamic State in the Middle East?

**MR. DELLA FERA**: Objection, lack of foundation.

11:32 **THE COURT**: I'll permit it. Overruled.

A. **No, they do not need to be in contact.**

**BY MS. GILBERT**:

Q. Who is Pamela Geller?

A. **Pamela Geller is the head of a group called the American Freedom Defense Initiative. It's also often known as the Stop the Islamization of America.**

**And she believes, in my view, in a somewhat-conspiratorial way; that there's a somewhat-secret effort of Muslims to spread Islamic law around the United States.**

21 of 46

**MR. DELLA FERA:** Object on 403 grounds.

**THE COURT:** Well, I don't know what it is that he's going to say about it yet, so I can't really decide it.

**BY MS. GILBERT:**

11:33 Q. Let me ask you a more specific question. Does Pamela Geller organize events?

A. **Yes, she does.**

Q. And what is the event organized to do?

A. **The events are usually organized to either to put down**

11:33 **Islam and to kind of mock it or make fun of it, or to warn about the dangers of Islam spreading in the United States.**

Q. And has the Islamic State actually called her out as one of their targets?

A. **Yes.**

11:33 Q. Let's talk about the propaganda and the message a little more specifically. What social media do they use and how do they use it?

A. **They use almost every form of social media, and this is the problem with being somewhat older; I can't name them all these**

11:34 **days.**

**But they sometimes use Twitter and Facebook and YouTube as might be expected. They'll also use Kik and WhatsApp and others that my children could explain to you, but I'm sorry; I cannot.**

11:34 Q. Do they actually have a Facebook page?

22 of 46

A. **Facebook and Twitter have fairly aggressively tried to shut them down in recent years, but you'll have individuals who have pages or followers or supporters that are -- it's often somewhat of a kind of a whack-a-mole game where they'll pop up and then the organizations will figure it out and try to stop them.**

Q. You talked about reviewing these documents of the interviews of the recruits.

A. **Yes.**

Q. All right. What does the Islamic State appeal to? What are they trying to get out? What's their message and what's their allure?

**MR. DELLA FERA:** Objection, relevance.

**THE COURT:** Overruled.

A. **Their message, like any big organization, they have multiple messages. So one message -- and a lot of it is kind of phrased as, I'll say, kind of back and forth.**

**So one message is the Muslim world and Islam is under attack. So they'll show a lot of images of children being killed or blown up, really sad, legitimately sad stuff, but then they'll show themselves fighting back. Right? So the message there is, you know, what are you doing while people are dying? You should be coming and finding us.**

**So they will have a lot of images of really horrific violence. And that's the way a distinction is held as people**

23 of 46

of action. It appeals to a small subset of people, but a quite-real subset of people who are attracted by violence who think it's cool.

And they also push the idea of kind of good life in the Islamic state. So a lot of what they'll show is kind of combat footage, but then soldiers relaxing and a sense of brotherhood. And that's a lot of what appeals to them. It's a sense of meaning, right? I'm not just an ordinary person; I'm a defender of the faith. I'm part of something very big and strong.

It's a sense of community and part of this brotherhood of fighters and actions. And for some people the violence is empowering. It gives them a sense that they're rising above their day-to-day frustrations.

BY MS. GILBERT:

Q. In the cases that you have studied, have there been sort of rapid changes with people who do, in fact, become recruited or become a supporter?

MR. DELLA FERA: Objection. It's a lack of foundation.

THE COURT: No. I'll permit it.

BY MS. GILBERT:

Q. Go ahead.

A. There's variations where some people have been, you know, steadily getting more and more radical, but what's amazing

11:37
11:37
11:37
11:38
11:38

sometimes is someone who is perfectly normal -- or so it seems -- and three months later is dramatically different.

Part of it is many of these people are young people. And when you have young people, you often have dramatic change, right? That can be for good sometimes too, right? But this sort of thing is common in the terrorist world where someone will get introduced to an idea, get very excited about it, and relatively quickly move along the path of violence role.

Q. And when someone quickly moves along this path of violence, does their whole life change, or in the cases you studied are there dual lives happening at the same time?

**MR. DELLA FERA:** Objection, lack of foundation.

**THE COURT:** No. I'll permit it, in the cases he's studied.

A. In the cases I've studied, you often see people who are able to be, if you will, violent or raise violence during certain hours of the day and then lead a perfectly-normal life.

In the San Bernardino case, for example, you had people who for years had been radicalizing, but at the same time, in the husband case held a steady job; he was an inspector. And just before the attack, they went and dropped their infant child off with grandma and then carried out the attacks. So perfectly normal behavior co-existing with violence.

In the Garland, Texas, case with cartoonists one

25 of 46

person worked in a carpet-cleaning business. Another worked in a dentist office. So again, people living their lives, but at the same time able to use violence.

BY MS. GILBERT:

11:38 Q. What is a lone wolf?

A. We often refer to lone wolves as a terrorist who is inspired by a group or inspired by a cause but is not directly controlled by it. So it's not as if there was a leader of the terrorist group saying -- or subordinate saying you should do 11:39 this attack at this time at this place. Rather, it's a bunch of individuals acting on their own or in a very small group inspired by an idea.

So some of you will remember the Oklahoma City bombing way back when where -- the belief is the two people mainly 11:39 involved, that they were not organized by a right-wing exclusive organization. Rather, they were imbibing these radical ideas, and they acted on their own. And that's seen as -- the jargon we use is lone wolf.

Q. And in the call for attacks on the west, are they actually 11:39 looking for lone wolves, people to attack on their behalf?

MR. DELLA FERA: Objection, leading.

THE COURT: That is leading.

MS. GILBERT: Okay.

THE COURT: Sustained.

11:39 BY MS. GILBERT:

26 of 46

Q. In the public calls for attacks, do they say call us at this number and let us know if you want to join?

A. **In the public calls for attacks, it's a direct message to individuals. So they're saying attack, right? And shoot someone. Build a bomb. If you can't do that, hit them with your car; stab them. So it's a call to arms for followers around the world.**

Q. And, in fact, did people, as you say, call to arms, did people in your studies listen to this public message and conduct acts?

**MR. DELLA FERA:** Objection, leading.

**THE COURT:** Overruled. I don't believe it is.

A. **Yes. We have seen this in multiple places. So in Europe there was a man who, during France's Bastille Day celebrations ran a bunch of people over with a truck.**

**We saw similar operations in Germany and we've seen some operations in the United States where an individual or small group that acts on their own, not directly linked to the terrorist group in Iraq and Syria.**

**BY MS. GILBERT:**

Q. What is Jihad?

A. **Jihad has multiple meanings and many Muslims would say the word comes from the Arabic word struggle.**

**MR. DELLA FERA:** I think this has been covered by another witness. I'm going to --

27 of 46

THE COURT: I would presume that she's just going to follow up on it. I think it is, but go ahead. You may proceed.

A. **So for many people, it's a people's struggle to kind of be the best person you can be, be the best Muslim you can be.**

**But a group like the Islamic State and many scholars for that see it in the context of religious war and violence. So it can be defending the faith from attack. And it can be trying to expand the faith through war and through violence. And so someone who is a Jihadist in the context of the Islamic State is actually a compliment. It means --**

**BY MS. GILBERT:**

Q. A what?

A. **A compliment. I'm sorry. A compliment.**

Q. Compliment?

A. **Right. It means that there's a fight for the faith, so defending it who is heroic.**

Q. And you mentioned a moment ago sort of a priority list of targets, and I think I stopped you after cops, military, cartoonists. Is it okay to have other people on your target list?

A. **Absolutely. And so they would say, you know, the ideal is as high as you could get, but they recognize that not everyone can go after a senior official, not everyone can blow up a military base or attack the headquarters of the media company.**

So doing low-level, small-scale attacks are recognized and appraised. So the San Bernardino attacks, that was at a community health center. These were people like -- just ordinary people. And that was appraised by the Islamic State.

11:42 Q. In the propaganda video, the various that you've seen, do the Jihadist dress in a similar fashion?

A. Often they do. There are some variations, but often there's, if you will, a kind of, you know, look they'll go for, kind of often dressed in black or trying to otherwise portray themselves as warriors.

11:43 Q. And what is the significance of in a photograph, if someone is dressed like a warrior, holding up one finger?

A. In Islam --

MR. DELLA FERA: This is -- I'm going to object to cumulative.

11:43 THE COURT: I'll permit it.

A. In Islam, perhaps the core principle, is the idea of the unity of God, that there is one God, and no other -- nothing else should be worshipped. So they would reject Christianity saying Christians worship Jesus, and he is a prophet of God; not God.

11:43 So even pictures, say, you might revere a picture on the wall of grandpa. No. You revere one thing: God.

And so that extreme monotheism, right? Even extreme by other monotheist religions is the core of what many

11:43

29 of 46

11:44

11:44

11:44

11:45

11:45

Jihadists believe. So one finger is one God, but it's also a very extreme interpretation of that particular tenet.

BY MS. GILBERT:

Q. I know we talked about videos a moment ago, but let's focus specifically now on recruitment videos. Do folks from Islamic State and even supporters make recruitment videos?

A. Yes.

Q. Can anyone do one?

A. Basically, yes. What the Islamic State does differently than -- many groups in the past really were concerned about controlling their message. So they wanted to make sure that, you know, only the top people could put out propaganda.

But the Islamic State realized it could do a lot more if it allowed low-level people to do their own, and technology enabled that, right? 15 years ago not everyone could do a video. Now kids do it in school. So it's much easier to do.

And what that'll try to do is put out some basic content for people to play around with and then people will take that content and modify it or add their own. So you see all different sorts of supporters throwing in their own pitches, if you will, their own propaganda.

Q. All right. And referring to videos that were put out, was there something about burning an individual in a cage?

A. One of the worst videos they put out was in February 2015. There was a Jordanian pilot who -- Jordan was bombing the

30 of 46

11:45

**Islamic State. And they -- he is -- his plane was shot down or had mechanical problems, and he was captured by the Islamic State. And they showed him being in a cage and being burned alive. And then the cage was then kind of run over by a bulldozer and buried in rubble. And it was juxtaposed with bombing.**

**So what happens when you bomb? You have a big explosion with fire, and then you have lots of rubble and buildings collapsing and they show children trapped in rubble and blown up.**

11:46

**So this idea of kind of poetic justice, right? That they-are-doing-that-to-us-so-we're-going-to-do-it-to-them was a theme they put out, and it was extreme and violent, but it actually proved quite popular among the supporters.**

11:46

Q. How about beheading videos? Do they do those also?

A. **If you go way back to the early days of this group, back when it was Al-Qaeda in Iraq, the founder made his name with beheading videos.**

**MR. DELLA FERA:** Judge, I would object as non-responsive. The question was whether they made a video.

11:46

**THE COURT:** No. I'll permit it. I believe it was responsive.

**BY MS. GILBERT:**

Q. Go ahead.

11:46

A. **And so from the start, this organization made its**

 31 of 46

reputation with beheading videos. It's what set it apart from everyone else. And ever since then, they've done beheading videos.

Again, the Islamic State does more propaganda than anyone, so they do lots and lots of beheading videos, and they'll be usually Muslims, they, you know, they feel are deviant, which encompasses just about everything.

And then they'll -- we have also seen videos from what they call provinces from like-minded groups outside of Iraq and Syria that also behead people. And this has become just kind of a signature of the group, if you will.

Q. Do they have a flag?

A. Yes, they do.

Q. What does it look like?

A. It's a black flag with white Arabic writing on it.

Q. And what is the Arabic writing?

A. It's the core statement of the Islamic faith. So it's -- there is no God but God, and Mohammed is the prophet of God.

Q. Does the Islamic State have a weapon of choice?

A. The Islamic State uses lots and lots of weapons, but one of the most common as is true of rebel groups and gorilla groups around the world is the AK47, the automatic rifle.

Q. Does the Islamic State also put out recipes to make explosives from common household items?

A. This is something we first saw with one of the Al-Qaeda

32 of 46

groups that put out how to make a bomb with ingredients found in your mom's kitchen. And that was part of the propaganda, right? It's catchy, right?

And there's a lot of information put out by Jihadist groups, including the Islamic State on how to do violence, how to build explosives, how to acquire weapons. That is a part of what they do.

Q. Are you familiar with the English-language magazine Dabiq?

A. Yes.

Q. What, is it?

A. Dabiq was first put out in 2014, and it is the Islamic State's attempt to reach audiences, English-speaking audiences. And because English is not only obviously spoken in the United States and the United Kingdom but also kind of a common second language for many people around the world.

This was a good way for them to reach non-Arabic speakers, even though they weren't native English speakers. And it's a very impressive piece of propaganda. It explains Islamic State goals, it offers calls to arms, it offers advice on how to do attacks. There's a lot in there.

Q. And in the propaganda and the magazines and things, is there a common reference to our brothers?

A. Yes, there is. This term brothers is something that Jihadists often refer to one another as, brothers in arms, brothers in the struggle. That's the context they would use,

33 of 46

**and that's how they see it.**

Q. And in order for you to come to Key West, did the government pay for your time and travel and your preparation?

A. **Yes.**

11:49 Q. Have you reviewed all the evidence in this case?

A. **No.**

Q. And have you ever met anyone by the name of Harlem Suarez or Almlak Benitez?

A. **No.**

11:50 **MS. GILBERT:** If I may have just a moment.

**THE COURT:** You may.

**MS. GILBERT:** No further questions. Thank you.

**THE COURT:** Cross-examination?

**MR. DELLA FERA:** Yes, Your Honor, thank you.

11:50

***CROSS EXAMINATION***

**BY MR. DELLA FERA:**

Q. Good morning.

A. **Good morning.**

11:50 Q. You were discussing the cases that you have studied, correct?

A. **Yes.**

Q. How many of them are there that you have studied?

A. **Over the years? I'm going to say dozens but probably more.**

11:50 Q. And does that relate specifically to Islamic State or all

34 of 46

terrorist groups?

A. **I would say of the ones I've studied related to the Islamic State. I would say about 15. And then all groups, gosh, I don't know, but a lot more.**

11:51 Q. Now, you consider the San Bernardino matter one of the cases that you have studied?

A. **Yes.**

Q. Okay. And did you just gather information from news reports and court documents? Is that how you studied like, for

11:51 example, the San Bernardino matter?

A. **For San Bernardino, yes. What I often try and do is talk to officials involved in investigations or trying to disrupt appropriately. And understandingly that has to be a bit of a lag because officials don't want to talk to outsiders while**

11:51 **there's an ongoing case.**

**But in the case of San Bernardino, the two suspects were killed, so I was able to talk to government personnel who worked through that as well.**

Q. And what you learned was with regard to the San Bernardino

11:51 matter was the couple that was involved, they were devout Muslims, correct?

A. **Yes.**

Q. And they had -- they were devout Muslims, actually born, I believe, in Saudi Arabia, I believe; is that correct?

11:52 A. **I don't believe they spent time there, but they were**

35 of 46

**certainly devout Muslims.**

Q. And they were born into the Muslim faith as well?

A. **Yes.**

Q. So any call that they got summoned pretty much went to their faith, their core religious faith. Is that a fair statement?

A. **Perhaps. One thing that when you study these groups and individual -- when you say these individuals, you find that for many of them, obviously religion is part of the appeal, but they actually -- most of the people it's about personal pride or anger or revenge, rather than a very, kind of, nuance theological argument.**

Q. So revenge with regard to, for example, the defaming of the prophet Mohammed, correct?

A. **Yes.**

Q. So that sort of has a religious component; would it not? I mean the defaming of the prophet Mohammed?

A. **I would say it's in a lot of revenge, just to be clear, it's about violence against Muslims in the Middle East.**

**But, yes, there's certainly -- it's in the name of religion, but it's more of personal pride rather than pay attention to this statement by this very knowledgeable religious leader.**

Q. Well, you would have to be a devout Muslim to be offended by a cartoon of the prophet, correct?

36 of 46

A. **I would say that -- I would say certainly if you were a devout Muslim, you would be offended by a cartoon of the prophet.**

**But I would say if you were someone who took pride in your religion, even if you were not particularly devout, you would find it offensive.**

11:53

Q. All right. So you would have to be a proud -- at least a proud Muslim to be offended by a cartoon of the prophet?

A. **I would say proud not -- I think I would use proud, not devout, of course, the overlap.**

11:54

Q. Right. I guess pride is a little bit lower than devout?

A. **Well, devout to me implies a certain degree of knowledge. Pride, you can be proud of things you don't know anything about.**

11:54

Q. But you're usually proud in things that you are yourself, correct?

A. **Yeah. Or believe yourself to be. Absolutely.**

Q. Okay. Now, with regard to the Islamic State, they probably differ from other terrorist groups in the sense they're trying to create a sovereign state, correct?

11:54

A. **Yes.**

Q. And so when you talk to us about, you know, the terrorism including a non-state actor, Islamic State is trying to build its own country within I guess that area of the Middle East, correct?

11:55

A. **Yes.**

Q. All right. And they -- would you agree with me that the Islamic State specifically doesn't have a direct clash with the United States? I mean, they are contained within their geographical area. Is that a fair statement?

11:55

A. **This is a debating statement. I would say that there are a couple of areas of -- first of all, to state the obvious, once the United States began bombing them in 2014, there was a direct clash. And they saw that as reason they should be attacking the United States and pushed back. So, you know, right there, whether we agree with the bombing or not, that's quite real.**

11:55

**Before that bombing, they saw themselves as eventually wanting to fight the United States but way in the future. They were much more focused on the immediate region of Iraq and Syria.**

11:56

**And so to the extent that the United States has, you know, humanitarian reasons like wanting to stop sexual slavery, to the extent the United States has concerns about allies that they have concerns about.**

11:56

**But the Islamic State and its predecessor Al-Qaeda in Iraq did attempt a feud but were limited. Terrorists were parked outside the region, but they were quite limited. It was not a massive effort, and that changed in 2014.**

11:56

Q. And when it comes to the these attacks that you've

38 of 46

mentioned to us, the Garland, Texas, matter, the San Bernardino, and the Pulse, would you agree with me that Islamic State did not coordinate those attacks?

A. **Yes.**

11:56 Q. And whether -- if someone acts in a violent manner, and claims that they did it on behalf of Islamic State, that does not mean that, in and of itself, that the Islamic State coordinated that attack, correct?

A. **That's correct.**

11:57 Q. And it might be Islamic State's modus operandi to take credit after an attack was held, correct?

A. **Yes.**

Q. But that doesn't mean -- that, of course, is, I guess, convenient for them to take credit for something that they didn't even coordinate?

11:57

A. **Right. They would say they inspired it, so they get credit. But you're using the word coordinate, and I would agree they didn't coordinate.**

Q. And would you agree with me that the Islamic State is primarily trying to reach out to Muslims throughout the world, correct?

11:57

A. **Yes.**

Q. And so when they -- their propaganda goes to, you know, the revenge for a bombing of a town where Muslim children were killed, they want to send their message of revenge to other

11:58

 39 of 46

Muslims so that they're angered by it?

A. **That's one of the their main purposes.**

Q. Right. I think you -- some of the other focuses had to do with -- well, let me strike that. Let me strike that. Okay.

11:58 I want to talk to you a little bit more about the cases that you've studied. You pretty much studied these cases after they occur, correct?

A. **Yes.**

Q. So it's almost impossible to know how many people thought

11:58 about doing an attack and never did it, correct?

A. **Yes.**

Q. I mean, there's just no way to know that, right? Is there any statistical analysis on that?

A. **There's many attempts to try to figure this out by looking**

11:59 **at before and after things, but there's no good statistic that I'm aware of.**

Q. Right. I mean, you wouldn't deny that that does happen, correct?

A. **Oh, of course.**

11:59 Q. And are you aware of instances where a person was instigated or persuaded to carry an attack in the name of ISIS but backed out of it and didn't do it? Are you aware of any specific instance about that?

A. **I know several in New York that have happened, yes.**

11:59 Q. So this is people that went -- maybe took steps but then

40 of 46

decided to pull back and not get involved?

A. **That's right.**

**MR. DELLA FERA:** Judge, I think that's all I have.

**THE COURT:** Redirect examination?

12:00 **MS. GILBERT:** Thank you.

***REDIRECT EXAMINATION***

**BY MS. GILBERT:**

Q. What does it mean to be a convert or a revert?

12:00 A. **A convert is someone who changes from one religion to another religion.**

Q. And in your cases that you studied about people that have carried out attacks, are any of them what you would call a convert to Islam?

12:00 A. **A surprising number in the west are converts. In Europe the figure is about 15 percent, which is extremely high given that I suspect a number of converts among European Muslims is about one percent.**

**There was a study that came out last year that said** 12:00 **that the lowest link to terrorism in the United States were converts, Jihadist was about 40 percent. So to me a staggering figure.**

**There are different ways --**

**MR. DELLA FERA:** I'll object to the characterization, 12:01 staggering.

**THE COURT**: I think the jury can understand what he meant and deal with it. Overruled.

**BY MS. GILBERT**:

Q. Are you finished?

A. **Yes.**

Q. So I think we can just say it was 15 percent of the people that conducted attacks in Europe were converts, and in the United States 40 percent?

A. **I would say people --**

**MR. DELLA FERA**: This has already been asked and answered.

**THE COURT**: Well, I'm -- I thought it had too, but he seems to be changing something.

A. **Forgive me to nitpick. It's not people who conducted attacks. It's people linked to terrorist plots. So some of them might have been disrupted before they did anything.**

**BY MS. GILBERT**:

Q. And you were asked a question about devout Muslims by defense counsel, so I want to follow up on that.

Is everyone that's conducted an attack in your studies a devout Muslim?

A. **No.**

Q. Are there people who are not even Muslim?

**MR. DELLA FERA**: I'm going to object to the form of the question as vague.

42 of 46

**THE COURT**: Are there people that are -- well, ask a different question, I guess.

**BY MS. GILBERT**:

Q. Is every single person who has conducted an attack in the United States, do they claim their religion to be a Muslim?

A. **No.**

Q. And in your studies, do you find that people that have conducted attacks are very religiously observant?

A. **Often --**

**MR. DELLA FERA**: Judge, I'm going to object. If it's related to ISIS, Islamic State, then I have no objection --

**THE COURT**: Yeah. The question was not limited, so do you intend to limit your question to people that have attacks that are -- I don't know what -- credited to the Islamic State?

**MS. GILBERT**: I'll rephrase the question.

**BY MS. GILBERT**:

Q. In your studies people that are recruited by the Islamic State, are they religiously devout? Are they religiously observant?

A. **The answer often surprisingly people is often very minimal. I referenced earlier these thousands of personnel records that had been released and published in German newspapers.**

**One of the questions they would ask recruits was how much do you know about Islam? And the significant majority of the recruits said either none or very little. And they were --**

43 of 46

**There's been other studies. This one, not in the west but in Pakistan, saying it's often people who have very little religious knowledge because it's easy to manipulate them.**

Q. Easy to what?

A. **Manipulate.**

Q. Manipulate?

A. **Islam says to do X, and if the person doesn't know any better, they'll nod their head. And the more you know about your religion, the less likely you are to commit a crime.**

Q. In these interview records that you received are from the Islamic State?

A. **Yes.**

Q. Thousands of recruits?

A. **Uh, no.**

Q. And when they answered the question what do you know about Islam, the answer was what?

A. **There were multiple levels of --**

**MR. DELLA FERA:** Objection, asked and answered.

**THE COURT:** Yeah. I think that you've made that point. He answered that already.

**MS. GILBERT:** Okay.

**BY MS. GILBERT:**

Q. Let's move to speaking Arabic. Is everyone that's conducted an attack on behalf of the Islamic State been an Arabic speaker?

44 of 46

**MR. DELLA FERA**: Objection, Your Honor, beyond the scope of cross.

**THE COURT**: No. I believe it's permitted.

A. **No.**

**THE COURT**: Go ahead. Another question.

**BY MS. GILBERT**:

Q. I'm sorry. Your Honor, you said?

**THE COURT**: Move onto another question. He already answered it.

**MS. GILBERT**: But the answer was accepted. Okay.

**BY MS. GILBERT**:

Q. And in your study of how the Islamic State conducts their business, is there any discussion, either through social media or through their public propaganda about being concerned with interception of their communications?

**MR. DELLA FERA**: Objection, beyond the scope of cross-examination.

**THE COURT**: It is beyond the scope of cross. It would have been appropriate for direct, but I don't know about now. What is it related to in cross?

**MS. GILBERT**: Where he said about ISIS trying to reach out to Muslims, it was in the conversation of how it occurred.

**THE COURT**: No, I'll sustain the objection. Move on.

**MS. GILBERT**: Okay.

**BY MS. GILBERT**:

45 of 46

Q. In your studies regarding Islamic State attacks here in the United States, is there any one consistent theme among the individuals who have agreed to or listened to the call to arms?
A. **There is a very common, I'll say, tendency among individuals who join up is the sense of anger and frustration, and that's often in their own lives a sense of that they're not where they want to be.**

**Some of them have problems with drugs or crime. Others with problems with jobs or family. And part of joining the Islamic State instantaneously turns them into someone important, someone powerful, someone who now has meaning. Now they're a warrior for a faith and gives them a broader sense of mission and community.**

**MS. GILBERT:** No further questions.

* * * * * * * * * * *

***(Thereupon, proceedings were held but not transcribed.)***

* * * * * * * * * * *

(Thereupon, the above portion of the trial was concluded.)

* * *

**C E R T I F I C A T E**

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

03/30/2017

DATE COMPLETED

GIZELLA BAAN-PROULX, RPR, FCRR