UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-10009-CR-MARTINEZ

UNITED STATES OF AMERICA

v.

HARLEM SUAREZ,
   a/k/a "Almlak Benitez,"
   a/k/a "Harlem Quintana,"
                        Defendant.
_____/

## GOVERNMENT'S SENTENCING MEMORANDUM AND RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR A DOWNWARD VARIANCE

     Pursuant to Title 18, United States Code, Section 3553(a), the United States of America, by and through the undersigned Assistant United States Attorney, hereby files this Response in Opposition to Defendant's Sentencing Memorandum and Request for a Downward Variance from the Sentencing Guideline Range (DE 164), and in support states as follows:

## LEGAL ARGUMENT

     It is well-settled that a district court must still consult the Sentencing Guidelines Manual and consider the advisory sentencing guidelines range for an offense of conviction prior to rendering a sentence. United States v. Crawford, 407 F.3d 1174, 1178-79 (11th Cir. 2005).  To properly calculate the sentencing guidelines range, the court must also consider departures – upwards or downwards – that may be warranted.  United States v. Jordi, 418 F.3d 1212, 1215 (11th Cir. 2005) ("the application of the guidelines is not complete until the departures, if any, that are warranted are appropriately considered."); U.S.S.G. § 1B1.1(b).

     After properly calculating the sentencing guidelines range, a district court must next consider and balance the sentencing factors in 18 U.S.C. § 3553(a) to determine a "reasonable"

1

sentence, which may be more or less severe than that provided for by the guidelines range. United States v. Talley, 431 F.3d 784, 786 (11th Cir. 2005). The court need not discuss each of the 3553(a) factors in rendering a sentence, United States v. Scott, 426 F.3d 1324, 1329 (11th Cir. 2005), so long as the record reflects consideration of the factors in general, Nelson v. United States, 555 U.S. 350 (2009).

Finally, in rendering a sentence, a district court must adequately explain the chosen sentence, including any deviation from the advisory sentencing guidelines range. *See, e.g.,* Rita v. United States, 551 U.S. 338, 356-57 (2007); United States v. Pugh, 515 F.3d 1179, 1191 n.8 (11th Cir. 2008); *see also* Irizarry v. United States, 553 U.S. 708, 714 (2008) (discussing the difference between a departure and a variance).

Here, imposing a sentence of life imprisonment, which is called for by the advisory sentencing guideline range, is appropriate under 18 U.S.C. § 3553(a). The government submits that a sentence of life imprisonment is entirely fair, just and reasonable given the nature and circumstances surrounding the offenses of conviction and consideration of other § 3553 factors.[1]

I. **A Downward Variance Is Not Warranted in this Case**

On April 1, 2017, the defendant filed a Motion for a Downward Variance from the Sentencing Guidelines Range Section (DE 164), wherein he stated that a downward variance from the advisory sentencing guidelines range of life imprisonment was appropriate. As calculated in the Pre-Sentence Investigation Report, pursuant to Section 2M6.1, the base offense level was set

---

[1] The government agrees with the PSR that the total offense level is 43, the defendant's Criminal History Category is VI, and the resulting guideline range is life. However, the Court may feel that there are factors present in this case based upon which the Court could find that a variance from the Guidelines range of life imprisonment is appropriate pursuant to 18 U.S.C. § 3553(a). Should the Court determine that a variance from the Guidelines is warranted, the United States asks that the Court sentence defendant to not less than 40 years' imprisonment followed by a life term of supervised release. The United States respectfully submits that a sentence of less than 40 years of imprisonment would vary inappropriately from the advisory Guidelines sentence in this case and is not warranted after taking into account all of the factors in Section 3553(a).

at an offense level 42. Thereafter, pursuant to Section 3A1.4(a), because the offense was a felony that involved, or was intended to promote, a federal crime of terrorism, the offense level was increased by 12 levels for a total adjusted offense level of 54, with a criminal history category of VI as mandated by 3A1.4(b). However, because the total offense level was in excess of a level 43, the total offense level was capped and treated as an offense level 43 pursuant to Chapter 5, Part A, comment n.2. Defense does not object to the PSI as calculated, but instead argues that a downward variance is appropriate.

The defendant is unable to argue that the guidelines and its applicable enhancement does not apply factually, and in fact has not filed any guideline objections to the PSI; but by asking for a downward variance from the guidelines, he is essentially asking the Court to disregard the enhancement nonetheless. The federal terrorism enhancement address serious concerns that require a higher sentence and the government would submit that there is no reasonable basis to justify departing from the considerable deference to which the guidelines are entitled. United States v. Courtney, 76 F. Supp. 3d 1267, 1282 (D. New Mexico 2014). *See also* Rita v. United States, 551 U.S. 338, 349 (2007).

 a. **The Nature and Circumstances of the Offense Conduct Warrants the Advisory Guidelines Sentence of Life Imprisonment.**

As part of the factors laid out in Section 3553(a), the Court is required to consider the nature and circumstances of the offense conduct – here, attempting use of a weapon of mass destruction, in violation of 18 U.S.C. § 2332(a)(2) and attempting to provide material support to a foreign designated terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1).

As the defendant himself points out, "it would be folly to suggest that the Court will not weigh this factor heavily against the Defendant," and readily admits that the "Defendant professed membership in, and allegiance to, a foreign terrorist organization, the Islamic State, and sought to

recruit like-minded individuals for the claimed purpose of carrying out attacks. He expressed a dual desire to obtain and to make a bomb and stated his intention to detonate them in places where the public gathers. After multiple meetings and communications with the government's informants posing as IS sympathizers, Defendant met with an undercover agent and took possession of what he believed to be a bomb and stated he would plant the bomb on the beach in Key West and detonate it at a time when unsuspecting beach-goers were present."

Notwithstanding these facts, the defense nonetheless argues that a sentence of a term of years is appropriate because "the Government was, to a great degree, in a controlling position as to how far this case would be taken." This statement is without merit as it was always the defendant's intention, well prior to the introduction of any government involvement in this case, to recruit like-minded individuals and to obtain bomb making instructions or a bomb itself. As the evidence at trial demonstrated, the defendant had established a Facebook account under the name Almlak Benitez wherein he posted and viewed numerous pro-ISIS and other terroristic videos and photographs, including photographs of himself armed with firearms and tactical gear, wearing the traditional headscarf, and holding up "one finger," the traditional reference to the Islamic State pledge of one god, while wearing a black "ski mask" to conceal his true identity. These photographs, videos, postings, and messages all clearly demonstrate his true beliefs and intentions in this case. Additionally, he conducted online research regarding ISIS, the ISIS black flag, weapons including the AK-47, how to build a bomb and a remote detonator, and the psychology of mass hysteria. Moreover, he sought to recruit numerous others via Facebook, including witness Nigel Allen, to join his cause of violent jihad, and had even made contact with a self-proclaimed ISIS member from Bangladesh. Prior to the government's involvement in the instant case, the Defendant amassed full tactical gear including bullet proof vest holders, multiple holsters and other magazine pouches, an arsenal of weapons, including 2 Glock handguns, multiple magazines, an

AR-15 assault rifle, and additionally attempted to obtain an AK-47 from a local gun dealer. The government was extremely fortunate in this case that they were able to ferret out the defendant's true intentions and monitor his every move to ensure that the defendant's plans were not surreptitiously carried out on innocent civilians.

In its support for a downward variance, the defendant claims that well prior to the defendant's receipt of an inert explosive device on July 27, 2017, the government had clear evidence that the defendant had violated 18 U.S.C. 2339B(a)(1), and should have arrested him at that point, thus capping the defendant's exposure to a 20 year statutory maximum penalty, but nevertheless sought a charge that carried a potential term of life imprisonment. Despite the defendant's assertions, the government merely followed a path and course of action that the defendant himself sought, and it was the defendant's sole decision to seek a bomb that he intended on detonating on a beach. He has no one to blame but himself for the situation in which he now finds himself. The defendant was provided numerous opportunities from which to withdraw or abandon his plans, yet each time, reaffirmed his desire to obtain a device that would cause large-scale damage. It was the defendant alone who purchased a backpack, nails, and a cell phone to be used as a remote detonator and it was the defendant alone who when informed that the nails attached to the device would "rip though people faster than bullets," took great delight in the fact that he would be potentially maiming women, children, and unsuspecting beach goers. It was the defendant alone who decided on July 27, 2015 to take possession of what he believed was a bomb and exited the vehicle, device in hand, for which he had received instructions and practice regarding its use and detonation. Allowing the defendant to express and carry out his true criminal intentions, albeit in a controlled environment, is not a mitigating factor. Rather, learning that the defendant was serious in his desire to obtain and detonate a bomb by allowing the defendant to act on his intentions only reaffirms the government's belief that this was the defendant's true intent

5

and desire in the instant case. As the old adage goes, actions speak louder than words, and in the instant case, the defendant's actions in negotiating with undercover agents and informants for the procurement of an explosive device, and then taking possession of such a device, speaks volumes as to the defendant's true goals, goals that were in fact reaffirmed by the defendant himself when he testified in his own defense and admitted that he did in fact plan on detonating the device, albeit in what he believed was a remote section of a deserted beach.

Accordingly, the nature and circumstances of the offense necessitate a sentence called for by the advisory sentencing guidelines.

      **b.**    **History and Characteristics of the Defendant**

In support of a term of years sentence and downward variance, the defense states that a life sentence is inappropriate because the defendant had no prior criminal history and is only 26 years old. Moreover, they claim that the defendant's psychological status both explains and mitigate the defendant's conduct. However, there are no salient characteristics or events in the defendant's background that mitigates against an advisory guidelines sentence or that support a reduction in sentence under 18 U.S.C. 3553(a), and in fact, supports such a sentence.

As the court is aware, the defendant was evaluated by a licensed clinical neuropsychologist, who determined that the defendant was competent to stand trial. Most notably however, the doctor determined that the defendant had a morbid curiosity with death and dying, his personality lacked internal cohesion, he wavered in his unpredictability in his behaviors, had deficits in social and personal attainments with a tendency to fall towards self-deprecating acts, had a deflated sense of self-worth, and was prone to impulsive outbursts and chronic moodiness which served as reinforcement for his tendency to withdraw socially. Moreover, Dr. Arias concluded that the defendant harbors feelings that he is misunderstood, unappreciated and demeaned by others, and has feelings of worthlessness, guilt, and self-doubt. These traits and findings all clearly support,

rather than mitigate, the belief that a guidelines sentence is appropriate, as these character traits are representative of individuals who are serious in their desire, or have in other cases reported across the country, caused death or serious bodily injury to others.

Moreover, the defendant states that there was parental pressure to reject a plea offer in this case, and that he rejected the plea offer because of the pressures of his parents to do so  This claim is without merit and irrelevant to the court's sentencing decision.  The defendant, at all stages of litigation, had the advice and counsel of very competent trial counsel, and was given every opportunity to admit guilt in this case.  The defendant, as a 26 year old man, readily capable of employment and interacting as a normal adult in society, was and is able to make his own decisions in life.  It appears that he was given every opportunity to be a law-abiding citizen and appears to have friends and family members who support him. According to the PSR, even his own mother reports that she was unaware of the defendant having any mental health issues.  He was given educational and employment opportunities. Nevertheless, the defendant decided to draft a Motion to Dismiss from jail wherein he stated that he was entrapped and had no intent to commit the crime.  Thereafter, the defendant made the decision to testify in his own defense and testified that he did what he did for a research project, in testimony that could be characterized as potentially obstructionist. Clearly, he did not plead guilty because he does not feel that he is in fact guilty of a crime.  The defendant even made the independent decision early on in the case not to meet with prosecutors to discuss the case and have the evidence explained to him in a readily understandable fashion.  To date, the defendant has not accepted responsibility for his actions or acknowledged the seriousness of his offenses.  The defendant needs to take responsibility for his own actions, and claiming that his parents pressured him not to plead guilty simply is not a reason for the court to vary downward in this very serious case.  Finally, as the Eleventh Circuit has held, "Terrorists, even those with no prior criminal behavior, are unique among criminals in the likelihood of

7

recidivism, the difficulty of rehabilitation, and the need for incapacitation." United States v. Jayyousi, 657 F.3d 1085, 1117 (11th Cir. 2011).

### c. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment for the Offense, to afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of the Defendant.

In determining a sentence, the Court is also required to consider the need for the sentence imposed to address the seriousness of the offense, the need for specific and general deterrence, the impact of the sentence on the defendant, and to protect the public from further crimes of the defendant. The prosecution in this case represents the Department of Justice's highest priority, to combat terrorism and other threats to national security. As the defendant himself pointed out, he "professed membership in, and allegiance to, a foreign terrorist organization, the Islamic State, and sought to recruit like-minded individuals for the claimed purpose of carrying out attacks. He expressed a dual desire to obtain and to make a bomb and stated his intention to detonate them in places where the public gathers. After multiple meetings and communications with the government's informants posing as IS sympathizers, Defendant met with an undercover agent and took possession of what he believed to be a bomb and stated he would plant the bomb on the beach in Key West and detonate it at a time when unsuspecting beach-goers were present." This crime is as serious as it gets, as reflected by a total offense level of 54, which is 11 points higher than the 43 point cap in which even the Sentencing Commission has stated is "rarely" exceeded. The guidelines call for a mandatory life sentence because in the instant case, the defendant professed membership in a foreign terrorist organization, attempted to recruit others to join his cause, expressed a desire to obtain a bomb, stated his intentions to harm not only innocent civilians, but as the transcripts pointed out, police officers and members of the military, and thereafter took possession of what he believed was an explosive device.

Due to the extremely serious nature of the crimes of conviction, there is a heightened need for the Court to impose an advisory guideline range sentence in order to send a message to this defendant and others like him that criminal conduct of this nature will not be tolerated, and will be severely punished by the United States in their attempt to combat terrorism in the homeland. As the Second Circuit has stated, "Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time." United States v. Meskini, 319 F.3d 88, 92 (2nd Cir. 2003). This offense conduct is serious – and should be treated that way. A downward variance from the advisory guidelines sentence is simply inappropriate in the instant case.

      d.     **Avoidance of Unwanted Sentence Disparities**

The government agrees that a goal of sentencing is to avoid unwanted sentence disparities, but as the court is aware, each case is unique and must be judged independently on the specific facts of the case. While the defense has directed the court to several cases where the sentencing court has imposed sentences of less than life, there have been numerous instances where life sentences or sentences of at least 40 years have been imposed for individuals who have attempted to detonate weapons of mass destruction. For instance, in United States v. Aldawsari, 5:11-CR-00015 (N.D. Tex. 2011), the defendant was arrested, charged, and convicted after trial of attempting to use a weapon of mass destruction in violation of 18 U.S.C. 2332(a)(2)(A) & (D) for his online research and planned purchase of concentrated chemicals and equipment necessary to make an Improvised Explosive Device (IED) for use against persons and infrastructure in the United States. After a guilty verdict, the defendant was sentenced to life imprisonment. As the Fifth Circuit pointed out, "avoiding unwarranted general sentencing disparities is not a factor that

we grant significant weight where the sentence is within the Guidelines range." Aldawsari, 740 F.3d 1015, 1021 *citing* United States v. Diaz, 637 F.3d 592, 604 (5th Cir. 2011). In United States v. Abdo, W-11-CR00182 (W.D. Tex. 2013), the defendant was charged with attempting to use a weapon of mass destruction in violation of 18 U.S.C. 2332(a)(2)(A) as well as with the attempted murder of officers and employees of the United States and with the possession of a weapon in furtherance of a federal crime of violence. In *Abdo*, the defendant had planned an attack on US soldiers at a restaurant outside Fort Hood in Texas, planning initially to use explosive devices to cause the maximum number of casualties and then using a handgun to kill any survivors. Ultimately, the defendant was sentenced to life imprisonment after a guilty verdict. Finally, in United States v. Osmakac, 8:12-CR-00045 (M.D. Fla. 2012), the defendant was charged and convicted at trial for attempting to use a weapon of mass destruction in violation of 18 U.S.C. 2332(a) and the possession of an unregistered machine gun for his desire and plan to commit a violent attack in the United States having previously discussed his desire to use explosive devices and firearms to conduct an attack in the Tampa, Florida area. Osmakac was ultimately sentenced to 40 years imprisonment.[2]

Notwithstanding the defense cases cited, this Court must look to the specific facts of this case to determine an appropriate sentence. As the trial evidence pointed out, the defendant had established a Facebook account under the name Almlak Benitez wherein he posted and viewed numerous pro-ISIS and other terroristic videos and photographs, including photographs of himself

---

[2] In *Osmakac*, the government in its sentencing memorandum also cited to other cases wherein the defendant's were sentenced to life imprisonment for attempting to detonate weapons of mass destruction, including the "Times Square bomber" Faisal Shahzad, 1:10-CR-00541-MSG (S.D.N.Y. 2010), the "Christmas Day bomber" Umar Farouk Abdulmutallab, 2:10-CR-20005 (E.D. Mich. 2010), and Khalid Aldawsari, 5:11-CR-00015 (N.D. Tex. 2011) . While Suarez did not construct the bomb that he sought to detonate, his intent was the same as Shahzad, Abdulmutallab, and Aldawsari - namely to kill innocent people in a violent attempt to support his ideals.

armed with firearms and tactical gear, wearing the traditional headscarf, and holding up "one finger," the traditional reference to the Islamic State pledge of one god, while wearing a black "ski mask" to conceal his true identity. Additionally, he sought to recruit numerous others via Facebook, including witness Nigel Allen, to join his cause of violent jihad in the name of ISIS, and had even made contact with a self-proclaimed ISIS member from Bangladesh and created a recruitment video wherein he discussed his beliefs and goals. Moreover, prior to the government's involvement in the instant case, the defendant amassed full tactical gear including bullet proof vest holders, multiple holsters and other magazine pouches, an arsenal of weapons, including 2 Glock handguns, multiple magazines, an AR-15 assault rifle, and additionally attempted to obtain an AK-47 from a local gun dealer. As the evidence pointed out, many months before any FBI involvement, the Defendant utilized his electronic devices to conduct research which included ISIS, the ISIS black flag, weapons including the AK-47, how to make a bomb, and the psychology of mass hysteria. Thereafter, when engaged with the confidential source and undercover agents, he expressed his desire to build a bomb, attack innocent civilians, military, and police officers among others, and expressed delight when informed that he bomb he was about to take possession of would "rip through a person faster than a bullet" causing grave injury. He purchased and utilized bomb making precurser chemicals and conducted online research regarding the use of a timer bomb. Ultimately, and without hesitation, the defendant took possession of what he believed to be was a bomb, and was arrested. Unlike other defendants who have received reduced sentences upon a guilty plea, to date, the defendant has shown no remorse and has not accepted any responsibility for his actions.

## CONCLUSION

For the foregoing reasons, the government respectfully states that the Court impose the advisory guidelines sentence of life imprisonment, and deny the defendant's request for a

downward variance as a sentence of life imprisonment is entirely fair, just and reasonable given the nature and circumstances surrounding the offenses of conviction and consideration of other § 3553 factors.

        Respectfully submitted,

        BENJAMIN G. GREENBERG
        ACTING UNITED STATES ATTORNEY

By: /s/ Marc S. Anton_____
     MARC S. ANTON
     Assistant U.S. Attorney
     Florida Bar No. 0148369
     99 N.E. 4th Street, Suite 815
     Miami, Florida 33132
     Tel: (305) 961-9287
     Fax: (305) 536-4675
     Marc.anton@usdoj.gov

By: /s/ Karen E. Gilbert_____
     KAREN E. GILBERT
     Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 17, 2017, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

        /s/ Marc S. Anton_____
        Assistant U.S. Attorney